| | |
|---|---|
| 1 | KENNETH A. KUWAYTI (CA SBN 145384)<br>KKuwayti@mofo.com |
| 2 | MORRISON & FOERSTER LLP<br>755 Page Mill Road |
| 3 | Palo Alto, California 94304-1018<br>Telephone: 650.813.5600 |
| 4 | Facsimile: 650.494.0792 |
| 5 | EFRAIN STAINO (CA SBN 271715)<br>EStaino@mofo.com |
| 6 | MORRISON & FOERSTER LLP<br>425 Market Street |
| 7 | San Francisco, California 94105-2482<br>Telephone: 415.268.700 |
| 8 | Facsimile: 415.268.7522 |
| 9 | Attorneys for Non-Party<br>NEVRO CORPORATION |

**FILED**
JUN 20 2014
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BOSTON SCIENTIFIC CORPORATION,

    Plaintiff,

v.

DONGCHUL LEE,

    Defendant.

Case No. CV 14 80188 MISC. BLF

DECLARATION OF DONGCHUL LEE IN SUPPORT OF NON-PARTY NEVRO CORPORATION'S MOTION TO QUASH BOSTON SCIENTIFIC CORPORATION'S SUBPOENA FOR PRODUCTION OF DOCUMENTS AND THINGS

Date:  TBD
Time:  TBD
Ctrm:  TBD





LEE DECL. ISO NEVRO'S MOTION TO QUASH BSC'S SUBPOENA
CASE NO.
pa-1648869

I, Dongchul Lee, hereby declare as follows:

1. I have personal knowledge of the facts stated in this declaration, and I could and would testify competently to them if called upon to do so.

**Background and Education**

2. I live in Agua Dulce, California. I have lived and worked in California throughout the entire time period relevant to this lawsuit.

3. I received a Bachelor of Science from Chung-Ang University in Seoul, Korea in 1993.

4. In 1997, I earned a Masters of Science in Electrical Engineering from the University of Houston in Houston, Texas.

5. In 2004, I earned a PhD in Biomedical Engineering from Case Western Reserve University in Cleveland, Ohio.

6. During my PhD program, I concentrated in computer modeling. My PhD dissertation was focused on computational modeling of the central nervous system and electrical stimulation of the nervous system.

7. In 2006, I accepted a position as a Senior Biomedical System Engineer in the Neuromodulation Division of Boston Scientific, which is located in Valencia, California.

**Employment at Nevro**

8. In 2013, I became dissatisfied with my career opportunities at Boston Scientific. As a result, I decided to resign. I was considering starting a consulting company, and discussed providing consulting services to Boston Scientific (as well as other spinal cord stimulation companies).

9. Nevro Corporation ("Nevro") learned that I was leaving Boston Scientific and offered me a job. Because I had heard of the clinically-superior results Nevro's 10 kHz SCS system was producing, and because I believed Nevro's HF10™ SCS therapy would one day make Boston Scientific's low frequency, paresthesia-based SCS therapy obsolete, I was excited about the prospect of working for Nevro. I therefore accepted Nevro's offer and officially began working for Nevro on November 8, 2013.

10. Nevro has never once asked me to disclose trade secrets or confidential information belonging to Boston Scientific. Further, Nevro's management team has repeatedly told me they see no commercial value in learning Boston Scientific's trade secret and confidential information.

11. On November 7, 2013, I signed Nevro's Proprietary Information Contract, which among other things states:

> During my employment by [Nevro], I will not improperly use or disclose any confidential information, intellectual property or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of [Nevro] any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless expressly authorized in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by [Nevro].

12. I have, and will continue to maintain, the terms of my above-stated agreement with Nevro. I have not improperly used or disclosed Boston Scientific's Proprietary Information.

**Employment at Boston Scientific and Expedited Discovery**

13. Throughout my tenure at Boston Scientific, I often worked from outside the office, either from home or from hotel rooms while traveling. I did not have easy access to my Boston Scientific email from outside of the office. As a result, I (and many of my colleagues) often forwarded documents to our personal email accounts in order to work from remote locations, such as our homes.

14. During my last two years at Boston Scientific, I had to travel for work extensively, including overseas trips to Australia, Canada, and Europe. Not only did this frequent travel cause difficulty for my family, but it also made it quite difficult for me to keep up with my work at Boston Scientific. During this timeframe, I worked very long hours, often at odd hours of the day and/or in significantly different time zones, which increased my need to work from home and from other outside locations. As a result, I asked Boston Scientific to provide me with a Smart Phone, which would allow me to access to my company email. Boston Scientific, however,

1  denied my request.

2  15.  Given the high volume of work that I had to perform remotely, I often forwarded work documents to my personal Gmail account so that I could access them and work on them from outside the office. From my work at Boston Scientific, I understand that many of my colleagues did so as well. In fact, my colleagues and I often shared documents stored on Google Drive as an easy means of collaborating.

16.  While many thousands of documents were produced in expedited discovery, I believe most of these documents are either published documents or duplicates of documents held in backup devices, some of which I did not find until performing a more thorough search of my home after commencement of discovery. Due to the nature of this case and the expedited discovery, I was not able to confirm which of the produced documents were actually confidential and/or proprietary to Boston Scientific.

17.  Through my attorneys, I offered several times to permanently delete any and all documents relating to Boston Scientific, whether confidential or not, that were contained on any computer or electronic storage device that I had at any time and using whatever manner Boston Scientific deems sufficient.

**The Nevro Laptops**

18.  When I started my employment with Nevro in November of 2013, I was assigned a laptop computer (the "Initial Laptop"), which I used to perform my job duties at Nevro.

19.  I used the Initial Laptop to build hypotheses based on Nevro's HF10™ spinal cord stimulation ("SCS") therapy clinical data. I also downloaded documents to the Initial Laptop that contain highly confidential information belonging to Nevro that is irrelevant to this lawsuit, and relates to, among other things, Nevro's high-frequency paresthesia-free HF10™ therapy. I also downloaded documents reflecting privileged attorney-client communications and attorney work product relating to Nevro's technology.

20.  I also used the Initial Laptop to communicate via e-mail with Nevro's in-house counsel, Peter Socarras, who is the company's Director of Intellectual Property, and with outside counsels Christina Lewis of Hinckley, Allen & Snyder, LLP, and Ken Kuwayti and Efrain Staino

LEE DECL. ISO NEVRO'S MOTION TO QUASH BSC'S SUBPOENA
CASE NO. _____
pa-1648869

3

of Morrison & Foerster LLP, about legal advice and strategy relating to this lawsuit.

21. In late December 2013, after Boston Scientific Corporation ("Boston Scientific") filed this lawsuit, Nevro instructed me to stop using the Initial Laptop. I stopped using the Initial Laptop at that time. On January 8, 2014, Nevro assigned me a new laptop (the "New Laptop"), which I received the following day.

22. I have used the New Laptop to conduct limited highly confidential research on computer modeling on behalf of Nevro that has not been publicly disclosed and that is irrelevant to this lawsuit. The New Laptop also contains confidential documents relating to Nevro's future marketing strategies. I have also used the New Laptop to communicate with Nevro employees using my corporate Nevro e-mail account about highly confidential work-related matters, including animal research and clinical research plans, that are irrelevant to this lawsuit.

23. I have also used the New Laptop to communicate via e-mail with Nevro's in-house counsel, Peter Socarras, who is the company's Director of Intellectual Property, and with outside counsels Christina Lewis of Hinckley, Allen & Snyder, LLP, and Ken Kuwayti and Efrain Staino of Morrison & Foerster LLP, about legal advice relating to this lawsuit. The New Laptop also contains documents reflecting communications with these attorneys, and documents created by these attorneys that relate specifically to the strategy for this litigation.

24. Since approximately the middle of March 2014, I have not conducted any work for Nevro and have been put on leave. Since that time, I have only used the New Laptop to communicate with my attorneys about the underlying lawsuit.

25. As part of my Certification of Compliance with the Court's Memorandum and Order on Boston Scientific's Motion for Preliminary Injunction dated May 14, 2014, I carefully examined the New Laptop and did not find any Boston Scientific Proprietary Information stored on the laptop.

26. I have not and will not disclose any confidential information belonging to Boston Scientific to Nevro.

LEE DECL. ISO NEVRO'S MOTION TO QUASH BSC'S SUBPOENA
CASE NO. _____
pa-1648869

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Agua Dulce, California, this 20th day of June, 2014.

_____
DONGCHUL LEE