1
2
3
4
5
6
7
8

United States District Court
For the Northern District of California

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN JOSE DIVISION

12

BOSTON SCIENTIFIC CORPORATION,    )    Case No. 5:14-mc-80188-BLF-PSG
                                                           )
13                                   Plaintiff,    )    (Case No. 1:13-cv-13156-DJC (D. Mass.))
                                                           )
14            v.                                        )    **ORDER GRANTING NEVRO'S**
                                                           )    **MOTION TO QUASH**
15    DONGCHUL LEE,                         )
                                                           )
16                                   Defendant.    )    **(Re: Docket No. 1)**
_____)

17            This case illustrates a recurring problem in all civil discovery, especially in intellectual

18    property cases.  A party demands the sun, moon and stars in a document request or interrogatory,

19    refusing to give even a little bit.  The meet and confer required by a court in advance of a motion is

20    perfunctory at best, with no compromise whatsoever.  But when the parties appear before the court,

21    the recalcitrant party possesses newfound flexibility and a willingness to compromise.  Think

22    Eddie Haskell singing the Beaver's praises to June Cleaver, only moments after giving him the

23    business in private.  Having considered the arguments, the court GRANTS Nevro's motion to

24

25    quash.[1]

26
27
28

_____

[1] *See* Docket No. 1.

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

## I. BACKGROUND

Plaintiff Boston Scientific Corporation and Nevro Corporation compete in the spinal cord stimulation ("SCS") device market.[2]  SCS devices treat chronic pain by delivering electrical pulses to a patient's spinal cord.[3]

In 2006, Dongchul Lee was hired by Boston Scientific as a senior biomedical system engineer.[4]  His work explored "low frequency" SCS devices, which mask pain with paresthesia mapping by delivering impulses to the spine below 1,200 Hz and often below 100 Hz.[5]  While at Boston Scientific, Lee entered into a confidentiality agreement.[6]  In October 2013, Lee resigned[7] and the following month he joined Nevro.[8]  At Nevro, Lee's research involves Nevro's "high frequency" SCS devices, which mask pain without the tingling sensation associated with paresthesia by delivering pulses at rates of 10,000 Hz.[9]

On December 13, 2013, Boston Scientific sued Lee, but not Nevro, in Massachusetts federal court, alleging that Lee's employment with Nevro breached (1) his confidentiality agreement and (2) Massachusetts trade secret law.[10]  On February 7, 2014, the court entered a

---

[2] *See* Docket No. 1 at 3-4; Docket No. 9 at 1-2.

[3] *See* Docket No. 4, Ex. A at 1.

[4] *See* Docket No. 3 at ¶ 7.

[5] *See* Docket No. 4, Ex. H at 2.

[6] *See* Docket No. 4, Ex. C at ¶ 28 ("In Section 3(c) of the Agreement, Dr. Lee agreed that he would not, during or after his employment with Boston Scientific, 'disclose any Proprietary Information to any person other than personnel authorized by Boston Scientific.'"); *id.* at ¶ 29 ("In Section 3(d) of the Agreement, Dr. Lee agreed that if his employment with Boston Scientific terminated for any reason, he would 'immediately deliver to Boston Scientific all property owned by Boston Scientific.'").

[7] *See* Docket No. 4, Ex. C at ¶ 34.

[8] *See* Docket No. 3 at ¶ 9.

[9] *See* Docket No. 4, Ex. A at ¶¶ 5-12; Docket No. 4, Ex. H at 3.

[10] *See* Docket No. 4, Ex. C at ¶¶ 48-56.

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

stipulated protective order.[11]   Lee subsequently produced large cache of Boston Scientific

documents.[12]   The Massachusetts court enjoined Lee from using or disclosing Boston Scientific's

proprietary information.[13]

On June 4, 2014, Boston Scientific served a subpoena on Nevro to produce (1) the

"computer(s) assigned to Donghul Lee as part of his employment with Nevro" and (2) all

"documents containing Proprietary Information."[14]   Following meet-and-confer, the parties agreed

to more narrowly-tailored document production regarding the latter category.[15]   They remain at an

impasse, however, over the former category: Lee's laptops.[16]

Nevro assigned a first laptop to Lee at the start of his employment and Lee used it to

perform his job duties at Nevro and communicate with his attorneys.[17]   After this lawsuit was filed,

---

[11] *See* Docket No. 9, Ex. 4 (The order covered "the disclosure and use of all documents, testimony, and other information designated 'confidential' or 'confidential – Attorneys' Eyes Only' which is produced or given by any Party in the course of discovery in this action.").

[12] *See* Docket No. 4, Ex. H at 4.

As part of the limited expedited discovery allowed by the Court, Dr. Lee produced over 300,000 pages, including documents stamped 'confidential' that provide details about Boston Scientific's plans for present and future research, research results and agenda for meetings regarding research.  In addition, Boston Scientific has presented additional evidence that it asserts supports its position that Dr. Lee has retained additional Boston scientific materials since his departure from the company.

[13] *See* Docket No. 4, Ex. H at 14-15.

[14] Docket No. 4, Ex. I at Schedule A.

The subpoena defines "proprietary information" as "any confidential, proprietary, and/or trade secret document or information belonging to Boston Scientific, not generally known to its competitors or the public, including but not limited to materials and information (whether or not reduced to writing) relating to its operating procedures, products, methods, service techniques, designs, specifications, trade secrets, cost data, profits, markets and sales, customer lists, plans for present and future research, development and marketing."

[15] Docket No. 4 at ¶ 2.

[16] *See* Docket No. 1.

[17] *See* Docket No. 3 at ¶ 18 ("When I started my employment with Nevro in November of 2013, I was assigned a laptop computer, which I used to perform my job duties at Nevro."); *id.* at ¶ 20 ("I also used the Initial Laptop to communicate via e-mail with Nevro's in-house counsel, Peter Socarras, who is the company's Director of intellectual Property, and with outside counsels

3

Nevro took steps to segregate the first laptop in the hands of a third party e-discovery vendor.[18]

Nevro also produced to Boston Scientific forensic information about the contents of the first laptop

in the form of file listing reports, which disclose extensive metadata of the files contained on the

laptop, USB reports, and web browsing history reports.[19]  When Boston Scientific pressed for

more, Nevro offered to have an independent vendor review a full forensic image of the first laptop

to search for pertinent information, including a review of any deleted files.[20]  Boston Scientific

refused.[21]

---

Christina Lewis of Hinckley, Allen & Snyder, LLP, and Ken Kuwayti and Efrain Staino of Morrison & Foerster LLP, about legal advice and strategy relating to this lawsuit.").

[18] *See* Docket No. 4 at ¶¶ 4-5.

> On January 3, 2014, shortly after Boston Scientific served Dr. Lee with process in this case, Dr. Lee's work laptop that had been assigned to him by his employer, Nevro, as well as Dr. Lee's personal laptop, were voluntarily turned over to forensic expert, Bhuvan Singh, of the company e-Stet.  e-Stet specializes in collecting, processing, searching and analyzing data in connection with litigation.  e-Stet also performs forensic data collections and analyses.

> I understand that on the same day that e-Stet received the laptops from Dr. Lee, Mr. Singh changed the password to a Google Drive account and a Gmail account maintained by Dr. Lee to ensure that no other person, including Dr. Lee, could access those accounts.  Dr. Lee has not had access to his personal laptop, the Initial Laptop, the Google Drive Account, and/or the Gmail Account since January 3, 2014.

[19] *See id.* at ¶ 9.

> Although we did not agree that the forensic discovery requested was contemplated by the Court's Order for Expedited Discovery, nor did we agree that the requested information was responsive to the Expedited Request for Production of Documents, we voluntarily agreed to produce the following:

>> a. Full browser history reports extracted from Dr. Lee's personal laptop and the Initial Laptop;

>> b. Full USB reports extracted from Dr. Lee's personal laptop and the Initial Laptop;

>> c. A full file listing for the Initial Laptop, which reflects the files contained on Dr. Lee's Initial Laptop with forensic information about the files;

>> d. A forensic image of USB drive (USB FD 20 PNY Flash Drive);

>> e. A forensic image of Dr. Lee's external hard drive;

>> f. The entire Google Drive Account (with Nevro confidential information redacted).

>> g. And, as noted above a complete image of all documents and emails from Dr. Lee's Gmail Account.

[20] *See id.* at ¶ 14.

> My colleague responded to this e-mail on March 14, by stating that he had consulted with Nevro after receiving the voicemail and "they are prepared to take you up on the proposal

4

On January 8, 2014, after this lawsuit was filed, a second laptop was assigned to Lee as a replacement for the segregated first laptop.[22]  Lee has used the second laptop to conduct limited confidential work on behalf of Nevro.[23]  Lee also has used the second laptop to communicate with his attorneys (both outside and in-house counsel) about this lawsuit, and with Nevro employees about confidential work-related matters.[24]  Before being used by Lee, the second laptop was used by other Nevro employees, including Nevro's former Director of Compliance, who handled some of the Nevro's most sensitive and confidential issues, and regularly communicated with in-house and outside counsel about legal matters.[25]

---

to have an independent vendor do an analysis of deleted files on a forensic image."
Dr. Lee's counsel suggested having a meet and confer call promptly to discuss why Boston Scientific felt this would not be sufficient to see if the concerns could be addressed in some way that could still preserve Nevro's confidential information.

[21] See id. at ¶ 15 ("The parties thereafter had a short call in the middle of the afternoon, and Boston Scientific rejected the idea of using an independent vendor to do the forensic analysis of the Initial Laptop.").

[22] See Docket No. 3 at ¶ 21 ("In late December 2013, after Boston Scientific Corporation filed this lawsuit, Nevro instructed me to stop using the Initial Laptop.  I stopped using the Initial Laptop at that time. On January 8, 2014, Nevro assigned me a new laptop, which I received the following day.").

[23] See id. at ¶ 22.

I have used the New Laptop to conduct limited highly confidential research on computer modeling on behalf of Nevro that has not been publicly disclosed and that is irrelevant to this lawsuit. The New Laptop also contains confidential documents relating to Nevro's future marketing strategies. I have also used the New Laptop to communicate with Nevro employees using my corporate Nevro e-mail account about highly confidential work-related matters, including animal research and clinical research plans, that are irrelevant to this lawsuit.

[24] See id. at ¶ 23.

I have also used the New Laptop to communicate via e-mail with Nevro's in-house counsel, Peter Socarras, who is the company's Director of Intellectual Property, and with outside counsels Christina Lewis of Hinckley, Allen & Snyder, LLP, and Ken Kuwayti and Efrain Staino of Morrison & Foerster LLP, about legal advice relating to this lawsuit. The New Laptop also contains documents reflecting communications with these attorneys, and documents created by these attorneys that relate specifically to the strategy for this litigation.

[25] See Docket No. 4 at ¶ 19.

I have also confirmed that the New Laptop, prior to being assigned to Dr. Lee, was used by other Nevro employees, including Nevro's former Director of Compliance, Nora Partain-McDaniel, who worked on some of the most highly confidential and sensitive

5

After Boston Scientific issued a subpoena for Lee's laptops, specifically demanding a complete forensic image of each, Nevro responded with a motion to quash.[26]

## II. LEGAL STANDARDS

Rule 45 of the Federal Rules of Civil Procedure authorizes the issuance of a subpoena to command a nonparty to "attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control; or permit the inspection of premises."[27]  "It is well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b)."[28]  Rule 26(b) authorizes parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."[29]

Although relevance is broadly construed pursuant to Rule 26, it does have "ultimate and necessary boundaries."[30]  While discovery should not be unnecessarily restricted, a court may limit discovery if "the discovery sought" is "obtainable from some other source that is more convenient, less burdensome, or less expensive" or if "the burden or expense of the proposed discovery outweighs its likely benefit."[31]  Discovery also may be limited to "protect third parties from harassment, inconvenience, or disclosure of confidential documents."[32]  A "court determining the

---

matters of the company, and frequently communicated with in-house and outside counsel about legal matters using her Nevro e-mail.

[26] *Id.*

[27] Fed. R. Civ. P. 45(a)(1)(A)(iii).

[28] *Edwards v. California Dairies, Inc.*, Case No. 1:14-mc-00007-SAB, 2014 WL 2465934, at *1 (E.D. Cal. June 2, 2014) (citing *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Service Center*, 211 F.R.D. 648, 662 (D. Kan. 2003) (quoting the Advisory Committee Notes to the 1970 Amendment of Rule 45(d)(1) and explaining that the amendments "make it clear that the scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules.")).

[29] Fed. R. Civ. P. 26(b)(1).

[30] *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006) (citations omitted).

[31] Fed. R. Civ. P. 45(c)(3)(A)(iv); Fed. R. Civ. P. 26(b)(2)(c).

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena."[33]  The court may quash a subpoena "in the event the subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information."[34]

"Once the moving party establishes that the information requested is within the scope of permissible discovery, the burden shifts to the party opposing discovery."[35]  "An opposing party can meet its burden by demonstrating that the information is being sought to delay bringing the case to trial, to embarrass or harass, is irrelevant or privileged, or that the person seeking discovery fails to show need for the information."[36]  A nonparty withholding subpoenaed information on the grounds of privilege must serve a privilege log describing the nature of the documents withheld so that the other parties may assess the privilege claimed.[37]

Fed. R. Civ. P. 45(d)(2)(B)(ii) "states that, when a court orders compliance with a subpoena over an objection, 'the order must protect a person who is neither a party nor a party's officer from

[32] *Dart Industries Co., Inc v. Westwood Chemical Co., Inc.*, 649 F.2d 646, 649 (9th Cir. 1980) (citations omitted).

[33] *Gonzales,* 234 F.R.D. at 680 (citing *Heat & Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1024 (Fed. Cir. 1986)).

[34] *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (quoting Fed. R. Civ. P. 45(c)(3)(B)).

[35] *Khalilpour v. CELLCO P-ship*, Case No. 3:09-cv-02712-CW-MEJ, 2010 WL 1267749, at *1 (N.D. Cal. Apr. 1, 2010) (citing *Ellison v. Patterson-UTI Drilling*, Case No. V-08-67, 2009 WL 3247193, at *2 (S.D. Tex. Sept. 23, 2009) ("Once the moving party establishes that the materials requested are within the scope of permissible discovery, the burden shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly burdensome or oppressive, and thus should not be permitted.").

[36] *Id.* (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353, n.17 (1978) (noting that "discovery should be denied when a party's aim is to delay bringing a case to trial, or embarrass or harass the person from whom he seeks discovery.").

[37] *See* Fed. R. Civ. P. 45(d)(2)(A)(ii); *see also Compaq Computer Corp. v. Packard Bell Electronics, Inc,.* 163 F.R.D. 329, 337 (N.D. Cal. 1995) (ordering production of privilege log to substantiate nonparty's objections to subpoena).

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

significant expense resulting from compliance.'"[38]  Only "two considerations are relevant" under

Fed. R. Civ. P. 45(d)(2)(B)(ii): "[1] whether the subpoena imposes expenses on the non-party, and

[2] whether those expenses are 'significant.  If these two requirements are satisfied, the court must

protect the non-party by requiring the party seeking discovery to bear at least enough of the

expense to render the remainder 'non-significant.'"[39]

## III. DISCUSSION

The dispute boils down to whether Boston Scientific is entitled to a forensic image of each

of Lee's two laptops.  Nevro argues that complete forensic imaging of the laptops is not warranted,

as both laptops contain privileged and confidential information – including Nevro trade secrets not

at issue in this case.[40]  Such an unbridled exam of Lee's laptops, says Nevro, risks disclosure of

protected information not the proper subject of discovery in this case.[41]  Because Lee only began

using the second laptop at issue in this case after this litigation began, there is no question that

laptop is not discoverable.[42]

Boston Scientific counters that forensic imaging of both laptops is necessary to determine

whether, when and with which hardware device Lee accessed, downloaded or used Boston

Scientific documents and whether any such documents were deleted subsequent to the initiation of

this litigation.[43]  Discovery has established that a Kingston "thumb drive" Lee produced in

June 2014 was plugged into Lee's Boston Scientific computer and then plugged into a different

---

[38] *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (quoting
Fed. R. Civ. P. 45(d)(2)(B)(ii)).

[39] *Id.* (quoting *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)) (internal
quotations omitted).

[40] *See id.* at 12-15.

[41] *See id.*

[42] *See id.* at 15-16.

[43] *See* Docket No. 9 at 5-6.

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

United States District Court
For the Northern District of California

1   computer for which Boston Scientific does not yet have an image.[44]  The Kingston thumb drive

2   image produced in June 2014 shows that Lee accessed documents from the Kingston thumb drive

3   in November and December 2013, when he was working for Nevro.[45]  But the image does not

4   show which computer Lee plugged the Kingston drive into in November and December, 2013

5   before accessing the documents.[46]  A forensic image of Lee's Nevro computer also will enable

6   Boston Scientific to determine whether Lee downloaded Boston Scientific documents from his

7   Google Drive and whether he subsequently deleted them after Boston Scientific filed suit.  Nevro

8   has provided a web browser history for Lee's Nevro computer that shows Lee accessed his Google

9   Drive locally multiple times between November 26 and December 18, 2013.[47]  But the web

10

11   ───────────────

12   [44] *See* Docket No. 11 at ¶¶ 11-14.

13       In comparing the provided USB report to the most recently supplied thumb drive
        images, I am unable definitively ascertain which thumb drive images represent devices that
14      have been previously connected to the Nevro computer. The reason for this is the provided
        images and their associated logs do not contain device serial numbers.

15       However, by comparing device names on the USB History Report with the names of the
16      thumb drive images Dr. Lee recently returned to Boston Scientific, it appears that a
        Kingston thumb drive from Dr. Lee's recent production was connected to his first Nevro
17      computer, most recently on December 12, 2013, shortly before Boston Scientific sued
        Dr. Lee.  Assuming that Dr. Lee has complied with his discovery obligations, then the
18      Kingston device plugged into both his Boston Scientific and Nevro computers is the same
        Kingston device for which he produced a forensic image in June 2014.

19       The reports from Boston Scientific's and Dr. Lee's first Nevro computers show that he
20      previously inserted the same Kingston jump drive into both machines. This is apparent as
        the USB device history reports reveal the same serial number,
        000AEBFEF596EBB1C35B041D.  Dr. Lee recently produced a forensic image identified
21      as a Kingston thumb drive.  However, as previously stated, that forensic image nor its
        associated log provides a serial number for the device.

22       The Kingston thumb drive contains documents that I am told relate to a confidential
        Boston Scientific study, the Whisper Project.  I understand that many of these documents
23      contain Boston Scientific Proprietary Information, and some are dated as recently as
        October 2013, the same month that Dr. Lee left Boston Scientific to join Nevro.

24   [45] *See id.* at ¶ 16 ("The forensic image of the Kingston thumb drive provided to Boston Scientific
25   on June 4, 2014 shows that several files I am told relate to the Whisper project, contain Boston
     Scientific Proprietary Information, and were accessed in November and December, 2013.").

26   [46] *See id.* at ¶ 17 ("There is no evidence to definitively ascertain which computer Dr. Lee plugged
27   the Kingston drive into before accessing Boston Scientific's documents.").

28   [47] *See id.* at ¶ 21 ("Nevro has also provided a web browser history for the Nevro computer. This
     web browser history shows that Dr. Lee also accessed his Gmail account from his Nevro computer

9

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

browser history from the Nevro computer, in the form provided by Lee's counsel, is incomplete and does not contain any download information before December 10, 2013.[48]  A forensic image of the Nevro computer will allow Boston Scientific to locate a full download history, which will show whether and when Lee accessed, downloaded, and used the Boston Scientific documents he retained in his Google Drive after leaving Boston Scientific.[49]  Pursuant to the Massachusetts court's protective order, any forensic imaging will be designated Attorney's Eyes Only, mitigating Nevro's concerns.[50]

Nevro has the better of the argument.  No doubt there exists discoverable information on the two laptops, but by demanding nothing less than a complete forensic image of not just one but two laptops belonging to a direct competitor, Boston Scientific demands too much.  Such imaging will disclose privileged communications related to the litigation as well as irrelevant trade secrets from a nonparty-competitor.[51]  Boston Scientific's subpoena therefore seeks discovery of protected matter, something plainly not permitted under Rule 45,[52] rendering the subpoena overbroad and imposing an undue burden on Nevro.[53]  Boston Scientific offers no precedent justifying, let alone

---

multiple times between December 10 and 19, 2013 and accessed his Google Drive locally multiple times between November 26 and December 18, 2013.").

[48] *See id.* at ¶ 22 ("The web browser history from the Nevro computer, provided by Dr. Lee's counsel, does not contain any download information before December 10, 2013.").

[49] *See id.* at ¶ 23 ("A forensic image of the Nevro computer would allow Boston Scientific to locate additional download history beyond that which is available from the web browser report provided by Dr. Lee's counsel, which could help determine whether and when Dr. Lee accessed, downloaded, and used the Boston Scientific documents he retained after leaving Boston Scientific.").

[50] *See id.* at 9; *id.*, Ex. 4.

[51] Because other Nevro employees also used the second laptop, forensic imaging will almost certainly disclose additional unexpected irrelevant information.  *See* Docket No. 1 at 14.

[52] *See* Fed. R. Civ. P. 45(3)(A)(iii) (The district court must quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies").

[53] *See* Fed. R. Civ. P. 45(d)(1); *see also* Fed. R. Civ. P. 45 advisory committee's note ("The theme of the new subdivision (c) is sounded in its first paragraph, paragraph (1), which imposes on the

10

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

requiring, the production of protected matter from a nonparty without any protections, and for good reason.  There does not appear to be any.

The risks attached to forensic imaging are simply too great to permit such unchecked discovery.[54]  Forensic imaging remains highly invasive and engenders the risk of unanticipated, accidental disclosure of crown jewels.[55]  This threat is particularly pronounced in competitor-competitor litigation, like this one.

As a fall back, Boston Scientific urges an alternative initially proposed by Nevro: the retention of an independent vendor to "review a full forensic image of the Initial Laptop to search for pertinent information, including a review of any deleted files."[56]  In light of the Ninth Circuit's opinion in *Legal Voice* and Nevro's prior voluntary compliance with Boston Scientific's two-pronged subpoena, the court is tempted to adopt this proposal and order that Boston Scientific pick up the tab.  The Ninth Circuit explained that pursuant to Fed. R. Civ. P. 45(d)(2)(B)(ii),[57] "when discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party.  If so, the district court must order the party seeking discovery to bear at least enough of the cost of

_____

attorney, or on a party acting pro se, the obligation of taking 'reasonable steps to avoid imposing undue burden or expense' on the subpoenaed person.").  Although Boston Scientific hedged its arguments by pointing to the protective order, this amounts to a concession that the laptops contain the privileged and confidential information at issue.  *See* Docket No. 9 at 8-10.

[54] This court previously has weighed in on the implications of unchecked discovery in the context of source code.  *See Apple Inc.* v. *Samsung Electronics Co., LTD.*, Case No. 5:12-cv-11-1846-PSG, 2012 WL 1595784, at *1 (N.D. Cal. May 4, 2012).

[55] *See* Wolters Kluwer, *Electronic Discovery: Law and Practice* § 9.02, 2014 WL 100186 ("Generally, the only complete collection method of a user's computer will entail creating a complete forensic image of the entire hard drive. When a user deletes a file, the file still resides on the hard drive until it is overwritten by new data. By acquiring a forensic image of an entire hard drive, one will be able to analyze and potentially extract deleted files that have not yet been overwritten.").

[56] Docket No. 1 at 2 (citing Docket No. 4 at ¶ 14).

[57] *See* Fed. R. Civ. P. 45(d)(2)(B)(ii) ("These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.").

11
Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH

compliance to render the remainder 'non-significant.'"[58]

But to allow Boston Scientific now to seek shelter from a fallback position that Nevro previously tendered in good faith would make a mockery of both parties' obligation to meet and confer in good faith from the start.[59]  The time to tap flexibility and creativity is during meet and confer, not after.

**IT IS SO ORDERED.**

Dated: August 4, 2014

PAUL S. GREWAL
United States Magistrate Judge

---

[58] *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (quoting *Linder*, 251 F.3d at 182).  The Ninth Circuit had "no trouble concluding that $20,000 is 'significant.'" *Legal Voice*, 738 F.3d at 1185.  The D.C. Circuit, too, has suggested that $9,000 may be sufficiently significant to justify cost-shifting.  *See Linder*, 251 F.3d at 182 ("The estimated expenses of compliance here amounted to $199,537.08.  Is this amount 'significant'?  We have no trouble concluding that it is.") (citation omitted).

[59] Drawing from a recent decision in this district, to accommodate Boston Scientific's demand would "encourage litigants to demand the moon thinking they can always fall back to something reasonable.  They should be reasonable from the start."  *Straight Path IP Group, Inc. v. Blackberry Limited*, Case No. 3:14-mc-80150-WHA, 2014 WL 3401723, at *1 (N.D. Cal. July 8, 2014).

12

Case No. 5:14-mc-80188-BLF-PSG
ORDER GRANTING NEVRO'S MOTION TO QUASH